## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TONDA WRIGHT,

       Plaintiff,

       v.                         Civil Action No. 10-901 (JEB)

DISTRICT OF COLUMBIA, et al.,

       Defendants.

## <u>MEMORANDUM OPINION</u>

Johnquan Wright was shot and killed on August 14, 2008.  His mother, Plaintiff Tonda Wright, has brought this suit on behalf of his estate and on her own behalf.  She claims that Defendants – the District of Columbia, which operated the D.C. Fire and Emergency Medical Service, and Rafael Sa'adah, the Acting Assistant Fire Chief at the time – are to blame for her son's untimely death because Chief Sa'adah inappropriately directed emergency response personnel to cease giving him life-saving care.  Because this Court finds that Plaintiff's sole federal claim cannot survive summary judgment, the remainder of the case will be dismissed without prejudice for Plaintiff to return to D.C. Superior Court if she so chooses.

## I.     Background

On August 14, 2008, D.C. Fire and Emergency Medical Service personnel responded to an emergency call at 33 K Street, N.W.  Def. Stat. Undis. Mat. Facts Nos. 1-2.  When emergency personnel arrived on the scene, they discovered two gunshot victims, one of whom was Plaintiff's son.  <u>Id.</u> No. 3.  They immediately began to assess his condition, Pl. Opp., Exh. 5

(Dep. of Christopher Young) at 11, and found that he was unconscious, not breathing, and without a pulse.  Def. Stat. Undis. Mat. Facts No. 3.  Meanwhile, Henry Lyles, a paramedic and 32-year veteran of the D.C. Fire Department, arrived and instructed emergency personnel to begin CPR on Wright.  Pl. Opp., Exh. 3 (Dep. of Henry Lyles) at 6, 11.  As they complied with this order, Rosalio Ruiz, the paramedic in charge of the team treating Wright, informed Chief Sa'adah, the senior official at the scene, that Wright had suffered a number of gunshot wounds, including one to the head.  Pl. Opp., Exh. 10 (Dep. of Rosalio Ruiz) at 73, 94; Pl. Opp., Exh. 9 (Dep. of Rafael Sa'adah) at 175-83.  This led Chief Sa'adah to conclude that Wright suffered from injuries incompatible with life and therefore should be presumed dead on arrival (PDOA). Sa'adah Dep. at 190-91; Pl. Opp., Exh. 11 (Fire Department Special Care Protocol on Presumed Dead on Arrival) (setting out that "patients may be presumed dead on arrival if apneic and pulseless with evidence of . . . [t]raumatic injuries incompatible with life").  Chief Sa'adah instructed emergency personnel to desist all life-saving efforts on Wright and to instead help their colleagues treat the other victim.  See Young Dep. at 11; Pl. Opp., Exh. 2 (Dep. of Lucy Jones) at 14; Lyles Dep. at 23-24.  Personnel complied with this order, and Wright received no further medical treatment.  Id.

An autopsy later revealed that Wright had in fact been shot twice in the chest and once in the leg, but not in the head.  See Def. Mot., Exh. 9 (Autopsy Report).  This finding has led several of the paramedics involved in the response call to conclude that Wright should not have been determined PDOA, and instead that he should have been treated at the scene and transported to a hospital.  Lyles Dep. at 15-16; Ruiz Dep. at 58-59, 94.

Plaintiff filed suit in May 2009 in the Superior Court of District of Columbia, asserting claims for medical malpractice and negligent hiring, training, and supervision under both the

Wrongful Death Act and the Survival Act.  The thrust of her suit was that Defendants

misdiagnosed her son's injuries, leading to the application of the wrong treatment protocol and

thus depriving him of a chance of survival.  She avers that though her son's injuries were life

threatening, he may have survived had he immediately received the appropriate emergency

medical care and been transported to a hospital.  Plaintiff twice amended her Complaint, first in

August 20009 and again in May 2010, the latter time to add a constitutional claim under 42

U.S.C. § 1983.  In response, Defendants removed the case to this Court, and the parties have now

filed Cross-Motions for Summary Judgment.[1]

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV.

P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by citing to particular parts of materials in the

record."  FED. R. CIV. P. 56(c)(1)(A).  "A fact is 'material' if a dispute over it might affect the

outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary'

do not affect the summary judgment determination."  Holcomb, 433 F.3d at 895 (quoting Liberty

Lobby, Inc., 477 U.S. at 248).  An issue is "genuine" if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380

(2007); Liberty Lobby, Inc., 477 U.S. at 248; Holcomb, 433 F.3d at 895.  The party seeking

summary judgment "bears the heavy burden of establishing that the merits of his case are so

---

[1]     In considering the parties' competing Motions, the Court has reviewed Defendants' Motion for Summary
Judgment, Plaintiff's Opposition thereto and Defendants' Reply, as well as Plaintiff's Partial Motion for Summary
Judgment, Defendants' Opposition thereto, and Plaintiff's Reply.

clear that expedited action is justified." Taxpayers Watchdog, Inc., v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987). "Until a movant has met its burden, the opponent of a summary judgment motion is under no obligation to present any evidence." Gray v. Greyhound Lines, East, 545 F.2d 169, 174 (D.C. Cir. 1976). When a motion for summary judgment is under consideration, "the evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Electric Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*); Washington Post Co. v. U.S. Dep't of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). She is required to provide evidence that would permit a reasonable jury to find in her favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott, 550 U.S. at 380 ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.    Analysis

The parties' competing Motions address both the sole federal claim and the pendent state claims.  Given that the Court grants Defendants' Motion related to the former, it need not address either side's position on the latter.

Plaintiff claims that Defendants have violated her and her son's constitutional rights under 42 U.S.C. § 1983.  Sec. Am. Compl., ¶ 72.  This statute reads, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of . . . the District of Columbia, subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."  In this case, Plaintiff asserts violations of the Fourth, Fifth, and Fourteenth Amendments.  Sec. Amend. Compl., ¶ 72.

### A.  Violations of IV and XIV Amendments

Plaintiff's claim based on Fourth and Fourteenth Amendment violations can be summarily dismissed.  She never alleges a search or seizure as required to establish the former, see U.S. CONST. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated."), and the latter does not apply to the District.  Scales v. District of Columbia, 973 A.2d 722, 725 n.1 (D.C. 2009) ("[T]he Fourteenth Amendment does not apply to the District of Columbia.").  These claims, moreover, have been conceded since Plaintiff did not respond in her pleadings to Defendants' arguments on those points.  See LCvR 7(b).

### B.  Violations of V Amendment

The Fifth Amendment prohibits the federal government from depriving citizens "of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.  Plaintiff has not

specified in her Second Amended Complaint what deprivation she claims occurred on August 14, 2008. Presumably, she pursues this action for the deprivation of life on behalf of her son and the deprivation of the liberty interest in her son's companionship on her own behalf. The latter, however, has been foreclosed in this Circuit since Wright was not a minor at the time of his death See Butera v. District of Columbia, 235 F.3d 637, 656 (D.C. Cir. 2001)("[A] parent does not have a constitutionally-protected liberty interest in the companionship of a child who is past minority and independent."); see also Al-Aulaqi v. Obama, 727 F. Supp. 2d 1, 16 n.1 (D.D.C. 2010); Autopsy Report at 1 (listing Johnquan Wright's age as 18); DC Code § 46-101 ("[T]he age of majority in the District of Columbia shall be 18 years of age."). The analysis as to both claims is nonetheless the same.

Defendants argue preliminarily that their Motion should be granted because Defendant Sa'adah's incorrect assessment of Wright's injuries did not lead to his death. In other words, Defendants' actions never deprived Wright of life. See Def. Mot. at 22. Plaintiff has presented evidence, in the form of two expert affidavits, that although her son's "condition was indeed dire, he was not beyond resuscitation," Pl. Opp., Exh. 7 (Aff. of Kevin R. Brown) at 6, and that his injuries were "survivable." Pl. Opp., Exh. 8 (Aff. of Stephen J. Joyce) at 4. Dr. Joyce went so far as to declare Defendant Sa'adah's decision to cease all aid as the proximate cause of Wright's death. Id. In reaching their conclusions, the two experts relied on the facts available to the Court: the depositions and statements by the various actors involved at the scene, the incident report, and the autopsy. See Brown Aff. at 1-3; Joyce Aff. at 1. (Although Dr. Joyce does not list the autopsy as part of the material presented to him for review, he refers to its findings in the report, leading the Court to conclude that he did in fact consider it before making his findings.) The experts' conclusion that "Mr. Wright very well could have survived" had he received "the

same life saving care provided the other patient at the scene," Joyce Aff. at 4, may not be enough to convince a factfinder that Defendants are to blame for Wright's death, considering the extent and seriousness of his injuries and the fact that the other patient died even though he received emergency care. See Young Dep. at 21. These expert affidavits are sufficient, however, to show that there is a genuine dispute of material fact as required under Rule 56(a) to survive this Motion. Compare Merit Motors, Inc. v. Chrysler Corp., 569 F.2d 666, 672-73 (D.C. Cir. 1977) (upholding summary judgment where trial court found that plaintiff's expert was unfamiliar with the record in the case and that his conclusions were no more than "theoretical speculations") with Ambrosini v. Labarraque, 966 F.2d 1464 (D.C. Cir. 1992) (finding that an expert's affidavit was enough to defeat summary judgment where he stated "a specific fact" based on his scientific knowledge and review of the case).

Plaintiff's constitutional claim nevertheless cannot survive Defendants' Motion for a separate and independent reason: the Fifth Amendment does not impose an affirmative duty on a state to protect the lives of citizens from third parties. In DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189 (1989), a mother whose four-year-old child had been beaten so severely by his father that he was rendered permanently mentally retarded sued a state social services provider. The Supreme Court found that a state could not be held responsible for the acts of a private citizen because the Fourteenth Amendment, "like its counterpart in the Fifth Amendment . . . was intended to prevent government from abusing its power, or employing it as an instrument of oppression." Id. at 196. Even though the state had previously intervened to protect the child and was effectively on notice that he was in danger, there was no duty to act because "the Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the

government itself may not deprive the individual." Id. This is because the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." Id. at 195. In short, the purpose of the Fifth Amendment is "to protect the people from the State, not to ensure that the State protect[s] them from each other." Id. at 196.

Plaintiff nonetheless avers that her Fifth Amendment claim can survive summary judgment because her son was in the custody of the District's emergency personnel at the time he died. Pl. Opp. at 44-45. DeShaney did discuss an exception to the general rule against state responsibility in the case of persons in custody: "[B]ecause the prisoner is unable by reason of the deprivation of his liberty to care for himself, it is only just that the State be required to care for him." 489 U.S. at 199. In so doing, the Supreme Court confirmed its previous decisions to this effect. See, e.g., Estelle v. Gamble, 429 U.S. 97, 104 (1976) (finding that states are required to provide adequate medical care to incarcerated prisoners, reasoning that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself"); Youngberg v. Romeo, 457 U.S. 307 (1982) (extending Estelle to patients involuntarily committed to mental institutions); City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 244 (1983) ("The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to [suspects in police custody] who have been injured while being apprehended by the police.").

In this Circuit, "the custody exception is narrowly construed" so that "[m]ere police interaction with or assistance to an individual . . . does not necessarily amount to custody." Butera, 235 F.3d at 648. In Moses v. District of Columbia, 741 F. Supp. 2d 123 (D.D.C. 2010), a

Court in this District considered the case of a man who had sought medical attention at a District Fire and Emergency Medical Services station for an apparent heart attack. He died while awaiting an ambulance even though the personnel on duty had medical training and had access to a defibrillator. That Court found that he had not been in the District's custody because the emergency personnel had returned him to his vehicle to await the ambulance.

Here, as Plaintiff has not presented any evidence that her son was taken into custody by emergency personnel, this case remains much closer to <u>Moses</u> than, for example, to <u>Harris v. District of Columbia</u>, 932 F.2d 10 (D.C. Cir. 1991), where the police restrained someone who was under the influence of PCP by handcuffing him and placing him in a police wagon and then delayed taking him to the hospital for an hour and a half. It cannot be said that the District by "affirmative exercise of its power so restrain[ed] [Wright's] liberty that it render[ed] him unable to care for himself." <u>DeShaney</u>, 489 U.S. at 200. Wright was rendered unable to care for himself by the unidentified person who shot him, and Defendants imposed no further restrictions on his liberty. They merely let him remain on the ground, where he tragically died. Even if Sa'adah had prevented others from treating him, this does not somehow transform his circumstances into custody. As Defendants never restrained his liberty, the Court cannot find that Wright was in custody for purposes of this exception.

Plaintiff alternatively argues that Defendants had a duty to help her son because, though they did not originally injure him, they "substantially worsened [his] condition[, which] resulted in his death." Pl. Opp. at 43. She thus invokes the state-endangerment exception to the general no-duty rule, which was adopted in this Circuit by <u>Butera</u>: "[A]n individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that

ultimately results in the individual's harm" where that conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  235 F.3d  at 651 (internal citation omitted).  The Court need not decide whether Defendant Sa'adah's behavior "shocks the conscience."  This is because Plaintiff has not made out the requisite showing of increased endangerment to fulfill the first prong of the <u>Butera</u> test.

There can be no doubt that Defendants did not create the danger that ultimately resulted in Wright's demise.  Whoever shot him did that.  <u>See id.</u> at 650 ("No constitutional liability exists where the State actors had no hand in creating a danger but simply stood by and did nothing when suspicious circumstances dictated a more active role for them.") (internal citation omitted); <u>see also</u> <u>Harris</u>, 932 F.2d at 14 (finding that the District had no duty to decedent where "[his] inability to take care of himself . . . was not due to anything the officers did but was instead a direct result of his ingestion of PCP").  The exception envisaged in <u>Butera</u> could be employed if the facts had been reversed – that is, if the District's acts had somehow left Wright vulnerable to attack by a gunman – because <u>Butera</u> allows for a constitutional claim where an individual falls prey to "third-party violence" due to the District's actions.  <u>Id.</u> at 651.  Yet here, as in <u>Moses</u>, "[i]t cannot be said that [D]efendant[s] placed [Wright] in greater danger than he would have been in had [they] done nothing at all." 741 F. Supp. 2d at 129.  While treating him may have conceivably saved his life, Defendants' actions did not increase or create the danger he would be shot. That is what the exception covers.

Plaintiff cites another decision in this District that considered the endangerment exception in a case brought by postal workers in the aftermath of the anthrax scare.  <u>See</u> <u>Briscoe v. Potter</u>, 355 F. Supp. 2d 30 (D.D.C. 2004).  They alleged that the head of their organization "intentionally misled Plaintiffs into believing the facility was safe and prevented them from

acting to preserve their own safety." Id. at 45. The Court found that the claim could proceed because the alleged conduct was an affirmative action. Id. at 44-45. Plaintiff argues that Defendant Sa'adah's misdiagnosis and wrongful application of the PDOA protocol likewise should be construed as an affirmative act rather than an omission of treatment. Yet, as in Butera, but not here, the government action in Briscoe preceded the harm. Here, the danger and injury had already occurred before Defendants' arrival at the scene. Plaintiff cannot argue, as those in Briscoe did, that but for Defendants' acts her son could have "act[ed] to preserve [his] own safety." Id. at 45. Regardless of how Defendants' acts may be described that night, it simply cannot be said that they created or increased the danger to Wright, who was unresponsive from the time they arrived until he was pronounced dead.

Since none of the DeShaney exceptions apply, Plaintiff's Fifth Amendment claim cannot survive summary judgment.

C. Municipal Liability

An independent ground to grant Defendant's Motion as to the District also exists. Even if Plaintiff could fit within a DeShaney exception, she has not sufficiently made out a governmental policy to hold the District liable. As set out below, this defense bars Plaintiff's constitutional claim against the District, though not against Defendant Sa'adah.

The Supreme Court has found that an "official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." Polk County v. Dodson, 454 U.S. 312, 326 (1981) (citing Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694 (1978)). Courts have found that "a city's inaction, including its failure to train or supervise its employees adequately, [can] constitute[] a policy or custom under Monell when it can be said that the failure amounts to deliberate

11

indifference towards the constitutional rights of persons in its domain." <u>Daskalea v. District of Columbia</u>, 227 F.3d 433, 441 (D.C. Cir. 2000) (internal quotations omitted). Plaintiff claims that this theory applies because the District failed to adequately train its emergency personnel. Pl. Opp. at 28-31. She points to a section of the June 2006 Inspector General Report in response to the death of David Rosenbaum, which found that emergency personnel had not appropriately treated the patient. <u>Id.</u> at 29.

The citation of the Rosenbaum incident is simply not enough for Plaintiff to survive Defendant's Motion. This is so for a couple of reasons. First, the only portion of the I.G. Report Plaintiff cites states that policies were violated. It does not stand for the proposition that the District fails to train or supervise its emergency personnel. Second, two incidents years apart and based on misdiagnoses of different injuries do not constitute evidence of a policy or a general lack of supervision or training.

As the Fourth Circuit stated in deciding a factually similar case, in which emergency response personnel failed to act properly and led to further injury to the plaintiff, "[W]hile a municipality's 'policy' of inaction need not be found to have effectively commanded the particular violation, it must be of such a character that municipal employees could reasonably infer from it tacit approval of the conduct in issue. For only so could the requisite causal connection between policy and constitutional deprivation be found." <u>Milligan v. City of Newport News</u>, 743 F.2d 227, 230 (4th Cir. 1984). Even when considered in the light most favorable to her, Plaintiff has not set forth facts to satisfy this requirement.

D.  Qualified Immunity

Defendant Sa'adah has also put forth a qualified immunity defense.  Because the Court will dismiss the case against him for the reasons set out in section III.B., *supra*, it does not reach this issue.

E.  Pendent Jurisdiction

District courts are given supplemental jurisdiction over state claims that "form part of the same case or controversy" as federal claims over which they have original jurisdiction.  18 U.S.C. § 1367(a).  By the same token, they "may decline to exercise supplemental jurisdiction over [such] claim[s] . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  § 1367(c)(3).  The decision of whether to exercise supplemental jurisdiction where a court has dismissed all federal claims is left to the court's discretion as "pendent jurisdiction is a doctrine of discretion, not a plaintiff's right."  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966), quoted in Shekoyan v. Sibley Intern., 409 F.3d 414, 423 (D.C. 2005).  When deciding whether to exercise pendent jurisdiction over state claims, federal courts should consider "judicial economy, convenience and fairness to litigants."  Id.  Nonetheless, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine —judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); see Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1267 (D.C. Cir. 1995) (finding the discretion set out in Carnegie-Mellon Univ. "unaffected by the subsequent enactment of 28 U.S.C. § 1367(d), in the Judicial Improvements Act of 1990").

Here the factors weigh against a retention of the case. The matter was originally pending in the Superior Court for a year before removal. This Court has handled nothing in the case beyond the current Motion for Summary Judgment and has not dealt at all with the pendent state claims. Compare Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370, 378 (D.C. Cir. 2010) (finding that district court appropriately retained pendent jurisdiction over state claims where it had "invested time and resources" in the case). Finally, Plaintiff will not be prejudiced because 28 U.S.C. 1367(d) provides for a tolling of the statute of limitations during the period the case was here and for at least 30 days thereafter. See Shekoyan, 409 F.3d at 419 (finding that because of this tolling, dismissal of the pendent state claims "will not adversely impact plaintiff's ability to pursue his District of Columbia claims in the local court system.") (internal citation omitted).

The Court declines to exercise pendent jurisdiction over Plaintiff's remaining state claims. Those will be dismissed without prejudice. A separate Order consistent with this Opinion will be issued on this day.

**SO ORDERED**.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: July 29, 2011

14